IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01510-MEH

GWENDOLYN L. HARTMAN,

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff, Gwendolyn Hartman, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **AFFIRMS IN PART AND REVERSES IN PART** the ALJ's decision**, AND REMANDS** the Commissioner's final order.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for

DIB [Administrative Record ("AR") 127-128] and for SSI [AR 129-137] filed on October 11, 2011. After the applications were initially denied on February 23, 2012 [AR 81-84], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for January 3, 2013 [AR 96-100]. Plaintiff and a vocational expert testified at the hearing. [AR 29-50] The ALJ issued a written ruling on January 25, 2013 finding Plaintiff was not disabled since January 4, 2012, because considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform her past relevant work as a housekeeping cleaner and laundry worker. [AR 9-24] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-6]. *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II. BACKGROUND

Plaintiff was born on June 28, 1955; she was 56 years old when she filed her applications for disability and supplemental security income benefits on October 11, 2011. [AR 127-137] Plaintiff claims she became disabled on March 10, 2010 [AR 127] and reported that she was limited in her ability to work by "back injury, high blood pressure, stroke, and mental breakdown." [AR 182] Plaintiff asserts she experiences pain in her lower back and head "each and every day." [AR 190] She also explains she "had a breakdown in Jan when I loss [sic] everything and now I can['t] get my mind to work the way it used to. I am sad all the time. I cry all the time. I want to kill myself all the time. I am just no[t] me." [AR 191] According to her application, Plaintiff's last day of work was September 30, 2010, because "of her condition(s)." [AR 182] Plaintiff states that she takes two

medications for her blood pressure and one medication for depression.  [AR 184]

Plaintiff's work history included housekeeping from 1995 to 2010, and various temporary jobs from March 2010 - September 2010.  [AR 183, 169-172]  Her earnings ranged from $4,561.05 to $9,444.82 during the period 1998-2009, and she earned $3,591.48 in 2010.  Her record shows no earnings in 2011 and 2012.  [AR 168]

Plaintiff provides copies of medical records dating back to March 2009; however, like the ALJ, the Court will review only those records concerning the identified disabilities for the relevant time period.  A medical record and worker's compensation report from March 10, 2010 reflects that Plaintiff suffered a back injury when was cleaning a bathtub, "felt a pop" and "pulled a muscle." [AR 323-325] The physician ordered x-rays and a toridol injection, prescribed pain medications and physical therapy, imposed restrictions for a modified work duty, and determined that Plaintiff would be at maximum medical improvement (MMI) at six weeks.  *Id.*  In addition, the doctor scheduled a follow-up appointment for March 22, 2010 (*id.*); however, the Plaintiff did not show up.[AR 322]

Instead, Plaintiff presented to the Pueblo Community Health Center (PCHC) on April 2, 2010 complaining of back pain and asking for a refill for her high blood pressure medication. [AR 269] She reported to the provider that she injured her back at work on March 10, went to physical therapy only twice; did some work under the doctor's restrictions but "got frustrated," so "discontinued employment with Marriott and thus her physical therapy has ended." [*Id.*] The provider noted Plaintiff's blood pressure was "well controlled," gave her a toradol injection for back pain, discussed physical therapy (but Plaintiff declined since it was a non-covered benefit), and refilled Plaintiff's blood pressure medication. [*Id.*] Three days later, Plaintiff presented again to

3

PCHC for stomach upset; the provider noted "[w]e saw her Friday for some back pain. Did not have this complaint."  [AR 268]

Plaintiff returned to Urgent Care (where she was seen for the worker's compensation report) on May 10, 2010 at which she complained of middle back pain. [AR 319-320]  The physician noted Plaintiff's medication for hypertension, diagnosed "acute myofascial dorsal strain," prescribed home exercises and medication (illegible), and projected Plaintiff would be at MMI by June 25, 2010. [*Id.*] Plaintiff reported that her last day of work was March 10; nevertheless, the doctor released her to a modified work duty and scheduled her for a follow-up appointment on May 17, 2010. [AR 321, 331] Plaintiff did not show for the follow-up appointment. [AR 331] A subsequent record from this facility dated July 19, 2010 states Plaintiff was "discharged from care" for Plaintiff's "noncompliance." [AR 330]

Plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on December 6, 2010 [AR 117-126]; however, there is no indication as to the outcome of these applications.

Plaintiff next presented to the PCHC on January 11, 2011 seeking reinstatement of her blood pressure medication (which she had not taken "secondary to thinking that she had housing, and she would no longer [be] qualified for the program") and complaining of stress from "dealing with Worker's Compensation and trying to get disability." [AR 267] The physician's assistant, PA Becky Kueter, diagnosed Plaintiff with hypertension and "situational stress," and referred her to "Spanish Peaks" and to "Carlos Rodriguez to assess whether or not the patient can work. I discussed with her physically there are no reasons for her not to be employed." [*Id.*] PA Kueter also "restart[ed] her

back on her blood pressure medications" and started her on Zoloft for depression and Flexiril for back pain. [*Id.*]

Plaintiff presented to the Parkview Emergency Department on February 18, 2011 complaining that she had been assaulted during an incident involving alcohol. [AR 242-244] Plaintiff suffered face/head and shoulder injuries, and was discharged home in "good condition." [*Id.*] The x-ray of her shoulder showed "normal," the x-ray of her head showed "no evidence of intracranial hemorrhage or skull fracture," and the x-ray of her face showed "no evidence of facial bone fracture." [AR 246-248] Four days later, Plaintiff presented to PCHC saying that she had been drinking and was assaulted outside a 7-11 store at which time her purse, containing her medications, was stolen. [AR 266] Plaintiff stated she was "doing better." PA Kueter refilled her blood pressure medications, as well as the Zoloft and Flexeril. [*Id.*]

Plaintiff presented to PCHC on March 10, 2011 asserting that her glasses had been broken during the assault and asking for a referral for an eye examination. [AR 265] Plaintiff also complained that she was "hypertensive," but admitted she had not taken her medication. [*Id.*] PA Kueter assessed Plaintiff with decreased vision, hypertension and "noncompliance." [*Id.*] Plaintiff was seen the next day at Parkview Emergency Department for "ETOH (alcohol) intoxication" and high blood pressure. [AR 233-235] She was released home three hours later in "good" condition.

On April 6, 2011, Plaintiff reported to an eye doctor that she "just had a stroke a week and a half ago." [AR 256] Other than Plaintiff's report, the provider mentioned nothing further about a possible "stroke."

Plaintiff next presented to the PCHC on August 22, 2011 at which she reported to PA Kueter

that had been off her medications and needed refills, that she was "doing fine" but felt like her blood pressure might be high, and that she was going to the state fair – at which she had worked for the last 10 years – to talk about a "job." [AR 263] PA Kueter noted that Plaintiff was "fairly noncompliant with her care," assessed her blood pressure at 131/90, and refilled Plaintiff's prescriptions for blood pressure, Zoloft and Previcid (stomach). [*Id.*] Plaintiff returned to PCHC on September 8, 2011 complaining of numbness in her left arm and hands. [AR 261] After examination, PA Kueter determined that Plaintiff had not had a stroke but, rather, "left arm neuralgia secondary to a brachial plexus contusion." [*Id.*]

Plaintiff filed the present applications for DIB and supplemental security income benefits on October 11, 2011. [AR 127-137] Plaintiff claims that she stopped work on March 10, 2010 due to her "disabling condition." [AR 127] However, a work activity report reflects that Plaintiff worked in June, July, August, and September 2010 for four different employers and quit each job "because of [her] medical condition." [AR 169-176] Plaintiff reported to the SSA that the medical conditions limiting her ability to work were back injury, high blood pressure, stroke,[1] and mental breakdown. [AR 182]

On November 1, 2011, Plaintiff completed a Personal Pain Questionnaire and a Function

---

[1]Plaintiff reports that she presented to Parkview Emergency Department for "strokes and I was assaulted" [AR 187]; however, the medical record from the date she listed, December 27, 2009, reflects that Plaintiff was seen at Parkview for a "nosebleed" and was diagnosed with "anxiety." [AR 250-251] She was admitted at 5:41 p.m. that day and discharged in "good condition" at 8:25 p.m. that day. [*Id.*] Other than the records described above from April 6, 2011 and September 8, 2011, there are no medical records until this time reflecting any complaints, assessments or treatment of a "stroke." Plaintiff also reports that she was treated at St. Mary Corwin Hospital for "strokes" [AR 187]; however, there are no medical records until this time from this facility.

(activities) Report for SSA Disability Determination Services. [AR 190-198] Plaintiff reported that she had pain in her lower back "each and every day," that movement, cold weather and "walking all the time" made the pain worse, she was currently homeless, she had a mental "breakdown" in January when she lost her home and pet cat, she was "tired of walking the streets - need a home so [she] can rest," she needed reminders to take her medications, she could walk about 4 or 5 blocks before needing to rest 20-30 minutes, she did not handle stress well because she "had 3 strokes," and she did not "like [her]self the way [she was] now; [she] worked for 42 years and look what happen[ed] to [her]!" [*Id.*]

Plaintiff presented to Brett Vallette, Ph.D. for a consultative mental health examination on January 4, 2012. [AR 282-284] She reported to Dr. Vallette that she suffered major depression and a breakdown, she could not work because of the depression and chronic pain in her back and knee, she finished high school and one year of college, worked primarily as a housekeeper and worked at Marriott when she hurt her back and "they let [her] go," she had been homeless for a year, lived in a tent and got food stamps, she had not abused alcohol for "a while" but could not say why and admitted to having two beers "on Tuesday," she "had a stroke in August 2011," but could not explain any details because "the doctor didn't tell me." [AR 282-283] Dr. Vallette assessed Plaintiff as "vague" about her symptoms; she did not seem to be in any pain, but was irritable; he never perceived any indication that Plaintiff had a stroke; and she was not currently suicidal and there was no psychotic process, PTSD, anxiety, or panic. [AR 283-284] He stated that Plaintiff was "difficult to diagnose ... because of her vagueness with her symptoms" but diagnosed her with "nonspecific

mood disorder, depression" and a GAF score of 60.[2]  Dr. Vallette concluded that he was concerned

---

[2]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR

about "symptom exaggeration" and Plaintiff "did not put much effort into the evaluation," and he determined that "from a psychological perspective, I do not see any work limitations at this time." [*Id.*]

Plaintiff next presented to Marshall Meier, M.D. for a consultative physical examination on January 7, 2012 complaining of back and hip pain. [AR 285-290] Plaintiff reported that she hurt her back in March 2010 when she "was lifting a box over her head and felt a crack"; the pain is constant in her lower back and does not radiate up into her back or into her extremities; her hip pain began the previous month and she was unsure of the cause; she was able to dress herself, get out of bed, bathe herself, cook and clean, and collect wood; had a stroke in 1985 with no residual effects; and she smoked four cigarettes a day and drank a beer or two a few times a week. [AR 285-286] Dr. Meier observed that Plaintiff was "extremely animated" and showed excessive movement in bending over, standing up, removing her shoes and getting on and off the exam table without any distress; she had no difficulty with speech and hearing, and was not agitated, anxious or drowsy; and her blood pressure was 120/80. [AR 286] After an extensive examination, Dr. Meier determined that Plaintiff had "no associated neurological findings" regarding her back and hip pain, but found she likely suffered rheumatoid arthritis based on her family history. [AR 286-289] He concluded that Plaintiff had no restrictions on her functional capacity, except that he asserted "concerns with patient swelling in her PIP joints, excessive manipulative activities may continue to cause worsening of her symptoms." [AR 289]

---

persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

Two days later, Plaintiff presented to PCHC where she complained to PA Kueter that she "had been having a cough and congestion now for approximately 2 months." [AR 317] Plaintiff reported that she also needed refills on her prescriptions for Lisinopril, Norvasc and Prevacid, but was no longer taking Zoloft, and was thinking about moving to Denver. [*Id.*] Plaintiff's blood pressure showed 110/65; PA Kueter assessed Plaintiff with an upper respiratory infection and hypertension, and refilled her prescriptions for the three requested medications. [*Id.*]

On February 23, 2012, the SSA sent to Plaintiff a Notice of Disapproved Claim informing her that her claims for DIB and SSI were denied. [AR 81-84]  Plaintiff then completed a Disability Report - Appeal form [AR 211-219, 222-226] and a Request for Hearing by Administrative Law Judge form [AR 85] on April 1, 2012.  On April 17, 2012, the Office of Disability Adjudication and Review (ODAR) sent Plaintiff a letter confirming receipt of the request for hearing, informing Plaintiff of hearing procedures and explaining that a Notice of Hearing will be sent at least 20 days before the hearing notifying her of the time and place.  [AR 86-93]

On April 24, 2012, Plaintiff presented to PCHC complaining of "domestic violence" saying "she was thrown down on the rocks." [AR 316]  Plaintiff was transferred to Parkview Emergency Department where she reported that she fell while walking down a hill and injured her right leg. [AR 363-367]  The physician noted that x-rays and examination showed any fracture to be unlikely; accordingly, the Plaintiff was discharged in good condition with pain medication and a "knee immoblilizer for comfort." [*Id.*]

On July 6, 2012, Plaintiff presented to Parkview Medical Center complaining of nausea, vomiting, diarrhea, and abdominal pain. [AR 345-362] She was diagnosed with acute gastroenteritis,

acute kidney injury, dehydration, and anemia, and discharged the same day after rehydration and her lab work improved. [*Id.*] Plaintiff returned to Parkview on August 12, 2012 with complaints of abdominal pain; she was provided IV fluids, pain medication and antiemetics, and was discharged when she improved.  [AR 332-344]

On October 29, 2012, the ODAR sent Plaintiff a Notice of Hearing informing the Plaintiff that the hearing would occur on January 3, 2013 in Pueblo, Colorado. [AR 96-100] Plaintiff acknowledged receiving the notice on November 28, 2012. [AR 107] A representative of Fastrak Rehabilitation Services was requested to appear as a vocational expert at the hearing.  [AR 105-106]

Meanwhile, Plaintiff presented to PCHC on November 13, 2012 complaining of hypertension (for which PA Kueter noted risk factors including African American race, heavy alcohol consumption, inactive lifestyle and smoking) and anxiety (for which Kueter noted Plaintiff was not taking Zoloft any longer and was not attending Spanish Peaks). [AR 373-375] After a physical exam, during which PA Kueter noted Plaintiff's blood pressure was 106/66, the provider found nothing out of the ordinary, refilled Plaintiff's blood pressure medications and started Plaintiff on Prozac. [*Id.*]

On December 4, 2012, Plaintiff completed an Appointment of Representative form reflecting that Rachel Lundy was retained as her attorney. [AR 108-109]

On December 13, 2012, Plaintiff saw PA Kueter again at the PCHC complaining of right leg pain. [AR 370-372] PA Kueter determined to "recommend conservative therapy but will get an x-ray with her history of chronic ETOH [alcohol] abuse. Possibly there was trauma without p[atien]t knowing." [*Id.*]

11

On December 20, 2012, the ODAR issued a reminder for the January 3 hearing to the Plaintiff and her counsel. [AR 111-112]  On December 29, 2012, Jose Vega, Ph.D. issued a letter to Plaintiff's counsel concerning a consultative mental health examination of the Plaintiff on December 27, 2012.  Plaintiff reported to Dr. Vega that she hurt her back lifting boxes while working at the Marriott; the worker's compensation would pay only for her medical care, not her living expenses, so she eventually lost her home and has been homeless for two years; she has received AND (Aid to the Needy Disabled) benefits for two years; she started drinking after her injury "in order to medicate for her depression"; she suffered a "mild stroke" less than two years ago and was hospitalized "for a few days" at Parkview Medical Center; she was also hospitalized for "pancreatitis" in July 2012; she suffers from cataracts and knee problems for which "they had to drain liquid from my knees"; her drinking became problematic in the last 3-4 years, but she had a DUI in 2005; her last drink was a beer that morning; she has been seen at Spanish Peaks Mental Health Center, but admitted she "needs to follow up with more mental health treatment"; she received some support from her brothers and sisters in New Mexico; and she had been sexually assaulted by her stepfather as a child; last year, she was raped by two men and reported these to the police, but also admitted she had been drinking; she had attempted suicide three times, the last being last year when she was taken to the hospital and her stomach pumped. [AR 377-382]

Dr. Vega noted that, despite her reports of sexual assault, Plaintiff did not present with any symptoms of post-traumatic stress disorder, but did appear anxious. [AR 379]  He found that Plaintiff functioned at a low- to borderline level of intelligence and, despite her pain complaints, she did not present with any significant pain behavior. [AR 380] Dr. Vega diagnosed Plaintiff with

major depression, recurrent, moderate to severe; anxiety disorder, NOS; and history of alcohol abuse, and assessed Plaintiff a GAF score of 55-60 (current). [AR 381] He noted that Plaintiff's depression and anxiety had not been treated on a consistent basis as "it is unclear as to how consistent she is taking the medication," and she "is in need of psychiatric intervention." [AR 381-382] Dr. Vega completed a Residual Functional Capacity [RFC] Evaluation (Mental) form in which he rated Plaintiff as having mostly moderate to marked limitations in understanding and memory, sustained concentration and persistence, and adaptation, and marked to extreme limitations in social interaction. [AR 383-384]

On January 3, 2013, the Plaintiff, her counsel, Rachel Lundy, and vocational expert Martin Rauer appeared for the disability benefits hearing. [AR 30-50] Plaintiff's counsel began by seeking to amend the disability onset date to January 4, 2012, the date of Dr. Vallette's report, which (according to the Plaintiff) was consistent with the state agency physician's opinion; the ALJ agreed. [AR 32-33] The Plaintiff then testified that she had been homeless for two years; lived in a tent with her boyfriend; rents a hotel room to get cleaned up when she gets her AND check; she tried to find work years ago but can no longer work because of back problems; she suffers from carpel tunnel and cataracts in both eyes (according to a doctor she saw in New Mexico in summer 2012); she was no longer thinking about moving to Denver; she stays in Pueblo because she has a storage unit holding her possessions, including clothing and furniture; she spends her days walking around collecting cans for recycling and money for food; she hurt her back working at the Marriott when she "went down to pick up something and [ ] heard a crack in [her] back"; has not worked since that time; the Marriott "didn't pay [her] workers comp at all" but she did not appeal and she lost her home;

13

workers comp did pay her medical bills, including "four treatments"; she and her boyfriend fought and he left her alone for days at a time; she had no choice but to walk around during the day carrying her backpack to "find a way to eat and survive," but she needed to take breaks along the way; and she ate her meals by herself at the soup kitchen or the park. [AR 33-43]

Mr. Rauer testified that an individual with Plaintiff's age, experience and education – who is able to occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds; can stand and/or walk for about six hours in an eight hour workday; can sit for about six hours in an eight hour workday; has no postural limitations, no manipulative limitations, no visual limitations, and no environmental limitations; is able to understand and remember both simple and moderately complex tasks that can be learned and mastered within three months; whose work duties should not require social interaction with the general public; and, in this environment, can interact appropriately with coworkers and supervisors; can tolerate work changes; can plan and set goals; travel; and recognize and avoid work hazards – could perform Plaintiff's past work as a housekeeper and laundry worker, as well as a number of other jobs.  He also testified that an individual with Plaintiff's age, experience and education – who can occasionally lift and or carry up to 20 pounds; frequently lift and or carry up to ten pounds; stand and/or walk for about six hours in an eight hour workday; sit for about six hours in an eight hour workday; must avoid concentrated exposure to extreme cold; is able to understand and remember both simple and moderately complex tasks that can be learned and mastered within three months; whose work duties should not require social interaction with the general public; and in this environment, can interact appropriately with coworkers and supervisors; tolerate work changes; plan and set goals; travel; and recognize and

avoid work hazards – could perform Plaintiff's past work as a housekeeper, as well as the other jobs

listed by Mr. Rauer.  Finally, he testified that an individual who would be off task 10% of the

workweek due to psychological factors would be unable to participate in competitive employment.

[AR 43-49]

The ALJ issued an unfavorable decision on January 25, 2013. [AR 9-24]

### III. LAW

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet

the insured status requirements of these sections, be under age 65, file an application for DIB and/or

SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423,

1382.  Additionally, SSI requires that an individual meet income, resource, and other relevant

requirements.  *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation

process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of

the Social Security Act, which is generally defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137,

140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful

activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is

a determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the amended onset date of her disability, January 4, 2012 (Step One). [AR 15] Further, the ALJ determined that Plaintiff had the following severe impairments – mild degenerative disc and joint disease of the lumbar spine, a mood disorder, and a depressive disorder – and determined that her high blood pressure, abdominal complaints, and substance abuse were not severe, as well as that her complaints regarding "stroke," "knee pain," "carpal tunnel syndrome," and "cataracts" were not medically

determinable impairments (Step Two).  [AR 15-16]  Next, the ALJ found that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled a listed impairment

deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 16-17]

The ALJ then determined that Plaintiff had the RFC to perform "medium work as defined

in 20 CFR 404.1567(c) and 416.967(c) except that she can sit, stand and/or walk for six hours during

an eight-hour workday; she has no postural, manipulative, visual or environmental limitations; she

can understand and remember both simple and moderately complex tasks that can he learned and

mastered within three months; her work duties should not require social interactions with the general

public; she can interact appropriately with coworkers and supervisors; she can tolerate work

changes, plan and set goals, travel and recognize and avoid work hazards."  [AR 18-23] The ALJ

determined that the record reflects Plaintiff's "medically determinable impairments could reasonably

be expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms and her allegedly restricted daily

activities are not well supported by the evidence." [AR 21] She further gave substantial weight to

Dr. Meier's opinion, some weight to the state agency physician's opinion, considerable weight to

Dr. Vallette's opinion, significant weight to the state agency psychologist's opinion, and little weight

to Dr. Vega's opinion. [AR 19-22]

The ALJ went on to determine that considering Plaintiff's age, education, work experience

and residual functional capacity, Plaintiff could perform her past relevant work as a housekeeping

cleaner and laundry worker (Step Four).  [AR 23]  As a result, the ALJ concluded that Plaintiff was

not disabled at Step Four of the sequential process and, therefore, was not under a disability as

defined by the SSA. [AR 24]

Plaintiff sought review of the ALJ's decision by the Appeals Council on February 20, 2013. [AR 8]  On April 17, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-3]  Plaintiff timely filed her Complaint in this matter on May 30, 2014.

## V. STANDARD OF REVIEW

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance

on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

On appeal, Plaintiff alleges the following issues: (1) the ALJ failed to account for limitations given substantial weight and failed to develop the record; (2) the ALJ failed to weigh the opinion of the state agency physician; (3) the ALJ improperly rejected opinion evidence supporting plaintiff's manipulative limitations; (4) the ALJ improperly rejected Dr. Vega's opinion; and (5) the ALJ did not offer a valid reason for elevating the opinion of the nonexamining physician.

## VII. ANALYSIS

The Court will address each of Plaintiff's issues in turn.

**A.    Whether the ALJ Accounted for Limitations Given Substantial Weight and Developed the Record**

The ALJ in this case found the following regarding Dr. Meier: "After conducting a physical examination in January 2012, Marshall Meier, MD, expressed the opinion that the claimant should have no exertional restrictions, though he had concerns about excessive manipulative activities, given the finding of finger swelling (Exh. 7F). Substantial weight is accorded Dr. Meier's opinion, though there is no other evidence that supports his discrete observation of finger swelling, and the manipulative restrictions do not square with the record as a whole." [AR 21]

Plaintiff argues that the ALJ, in determining the Plaintiff could perform "medium" work, failed to account for the postural limitations recommended by Dr. Meier, despite giving his opinion substantial weight.  Plaintiff also contends that, to the extent a consultative examiner's report is inadequate or incomplete, the ALJ was required to ask for the missing information or request a

revised report.  Defendant counters that the majority of Dr. Meier's report, as well as those of other physicians, demonstrate no postural limitations, and an ALJ is required to develop the record by re-contacting a physician only when she is unable to determine whether the claimant is disabled based on the evidence as a whole.  Plaintiff replies that it is improper for Defendant to make a *post hoc* rationalization for the ALJ's decision when it is not clear from the decision itself, and that without all relevant evidence concerning the postural limitations, the ALJ would be unable to make a proper disability finding.

As set forth above, Dr. Meier found Plaintiff had swelling in her PIP and DIP joints in her hands/fingers and, given her family history, determined Plaintiff likely suffered from rheumatoid arthritis. [AR 288-299] However, he also found "no associated neurological findings on exam" for Plaintiff's back pain and hip pain. [AR 289] In fact, the doctor noted that Plaintiff was "extremely animated" and showed excessive movement in bending over, standing up, removing her shoes and getting on and off the exam table without any distress.  He also noted "no discernable discomfort with the[ ] normal ranges" in Plaintiff's back and hips during examination. [AR 288] Accordingly, it is puzzling that Dr. Meier concluded simply, "[t]here are postural limitations recommended at this time" without noting why or what limitations were recommended. [AR 289]

Plaintiff contends that the regulations require an ALJ to contact a consultative examiner whose report is internally inconsistent.  20 C.F.R. § 404.1519p provides, in pertinent part:

(a) We will review the report of the consultative examination to determine whether the specific information requested has been furnished. We will consider the following factors in reviewing the report:

(1) Whether the report provides evidence which serves as an adequate basis for

decisionmaking in terms of the impairment it assesses;

(2) Whether the report is internally consistent; Whether all the diseases, impairments and complaints described in the history are adequately assessed and reported in the clinical findings; Whether the conclusions correlate the findings from your medical history, clinical examination and laboratory tests and explain all abnormalities;

...

(b) If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.

Plaintiff asserts that, because the ALJ failed to consider or correct the internal inconsistency in Dr. Meier's report, she suffered harm because, despite giving the opinion substantial weight, the ALJ found Plaintiff had "no postural limitations," failed to explain how this finding conflicts with Dr. Meier's opinion, and failed to include any postural limitations in the hypotheticals presented to the vocational expert.[3]  As a result, the ALJ determined Plaintiff could perform "medium" work, which may include frequent stooping and crouching; such determination appears to conflict with Dr. Meier's recommendation and, thus, the ALJ was required to explain why that portion of the recommendation was not adopted.

Defendant counters that the regulations require clarification from a physician "only" if the ALJ is unable to determine whether the claimant is disabled based on the evidence presented.

---

[3]Citing 20 C.F.R. § 404.1519n(c)(6), Plaintiff also argues that the omission of a statement about what the person can still do despite her impairments triggers the ALJ's duty to contact the examiner to obtain a complete report.  However, that section specifically provides, "[a]lthough we will ordinarily request, as part of the consultative examination process, a medical source statement about what you can still do despite your impairment(s), the absence of such a statement in a consultative examination report will not make the report incomplete."  *See* 20 C.F.R. § 404.1519n(c)(6).  Accordingly, the Court rejects this portion of the Plaintiff's argument.

Response, docket #17 at 18.   However, the Defendant cites what appears to be a former regulation, 20 C.F.R. 404.1520b(c), and a case that is distinguishable from this case, *Cowan v. Astrue*, 552 F.3d 1182 (10th Cir. 2008), in which the Tenth Circuit determined that an ALJ need not seek out additional information or a consultative examination if the evidence is sufficient to make a disability determination.  *Id.* at 1187.   In fact, after review of court opinions interpreting § 404.1519p, the Court notes that the vast majority of opinions involve facts different from those in this case – that is, whether an ALJ who has rejected or given little weight to an opinion for its internal inconsistencies must contact the physician for clarification or additional information.  *See, e.g., Sanders v. Colvin*, No. 2:13-cv-2090-TMP, 2015 WL 1268022, at *5 (N.D. Ala. Mar. 19, 2015); *Corn v. Comm'r of Soc. Sec. Admin.*, No. 5:13-CV-2458, 2014 WL 6809245, at *8 (N.D. Ohio Dec. 3, 2014); *Accomando v. Comm'r of Soc. Sec.*, No. 13-1391(FSH), 2014 WL 6389060, at *6 (D.N.J. Nov. 14, 2014); *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012) (interpreting a similar former regulation for treating physicians' reports, 20 C.F.R. § 404.1512(e)(1)).

However, in this instance, the ALJ has accorded Dr. Meier's opinion substantial weight and made no note of its unmistakable inconsistency.  Moreover, the ALJ failed to explain her RFC finding of "no postural ... limitations" in light of Dr. Meier's recommendation for postural limitations.[4]  The Court found only one case involving similar facts, *Ding v. Colvin*, No. 3:12-cv-1835, 2014 WL 1315386, at *21 (M.D. Pa. Mar. 28, 2014), in which the court found several bases on which to remand the ALJ's decision, including that the ALJ gave "great weight" to a physician

---

[4]The Court recognizes the possibility that Dr. Meier's recommendation simply contains a typographical error.  However, like an ALJ, the Court may not make speculative inferences from medical reports.  *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002).

whose opinion contained internal inconsistencies.  The court noted it was "troubled" by the ALJ's decision to afford the opinion great weight without any indication the ALJ considered its inconsistencies.  *Id.*  This Court, too, is troubled by the ALJ's lack of discussion or explanation of the inconsistency in Dr. Meier's opinion, particularly because the ALJ used the opinion to support her RFC finding that Plaintiff had "no postural ... limitations," which directly conflicts with Dr. Meier's recommendation for postural limitations.  *See Winfrey*, 92 F.3d at 1024 (where an ALJ's conclusions differ dramatically from an accepted physician's opinion, the ALJ must explain the difference); *see also Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (same).  The ALJ's failure to explain why she accepted Dr. Meier's opinion, but did not apply the postural limitations to the RFC requires remand "so that the ALJ can explain the evidentiary support for [her] RFC determination."  *Haga*, 482 F. 3d at 1208.

**B.      Whether the ALJ Improperly Failed to Weigh the Agency Psychologist's Opinion**

Plaintiff contends that the ALJ failed to weigh the opinion of the agency psychologist, Dr. Rizzo. [*See* AR 299-303]  Defendant counters that since Dr. Rizzo's opinion accepts and is nearly identical to Dr. Wharry's opinion (to which the ALJ accorded significant weight), she sufficiently discussed all uncontroverted and probative evidence.  Response, docket #17 at 19-20.  Plaintiff replies that the ALJ is not relieved of her duty to weigh Dr. Rizzo's opinion simply because she weighed an opinion with which Dr. Rizzo agreed.

It is undisputed in this case that the ALJ failed to weigh, or even to mention, Dr. Rizzo's opinion.  However, "[a]n ALJ must evaluate every medical opinion in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing former 20 C.F.R. § 404.1527(d)); *see also*

20 C.F.R. § 416.927(c).  Furthermore, the social security regulations state that, unless the treating source opinion is given controlling weight (which did not occur here), the ALJ "must" explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2)(ii).  The social security rulings require that an ALJ "may not ignore [the opinions of state agency consultants,] and must explain the weight given to these opinions in their decisions."  SSR 96-6P, 1996 WL 374180, at *1 (July 2, 1996).

In failing to even mention Dr. Rizzo's opinion in her decision, it is clear that the ALJ did not satisfy these requirements.  The parties and the Court can only speculate as to how the ALJ may have considered the other evidence in the case if she had taken Dr. Rizzo's opinion under consideration.  Therefore, the Court must remand the decision to the Commissioner for further consideration.  *See Threet v. Barnhart*, 353 F.3d 1185, 1192 (10th Cir. 2003) (failure to consider all relevant evidence in accordance with the regulations necessitates remand).

**C.     Whether the ALJ Properly Rejected Opinion Evidence re: Manipulative Limitations**

As set forth above, the ALJ found: "Substantial weight is accorded Dr. Meier's opinion, though there is no other evidence that supports his discrete observation of finger swelling, and the manipulative restrictions do not square with the record as a whole." [AR 21]

Plaintiff argues that the ALJ's reason for rejecting Dr. Meier's manipulative limitations are not supported by substantial evidence in the record.  Specifically, Plaintiff asserts that, because the absence of evidence is not substantial evidence, the ALJ did not have a proper reason for rejecting the limitations, and the ALJ ignored evidence of problems in Plaintiff's upper extremities found in other records.  Defendant counters that the ALJ was correct in finding no other evidence of

manipulative problems during the relevant time period (Jan 2012-Jan 2013), and the agency physicians both found that the record did not support a need for manipulative limitations. Plaintiff replies that the agency physicians' opinions cannot constitute substantial evidence because the ALJ did not consider one and, regarding the second, she accorded greater weight to Dr. Meier's opinion.

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)). "An ALJ may dismiss or discount an opinion from a medical source only if his [or her] decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he [or she] provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)). "However, an ALJ need not 'apply expressly each of the six relevant factors in deciding what weight to give a medical opinion,' so long as he provides 'good reasons in his decision' for the weight accorded to each opinion." *Thielemier v. Colvin*, No. 12-cv-03178-PAB, 2014 WL 1292885, at *3 (D. Colo. Mar. 31, 2014) (quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)). In addition, "[a]n ALJ's rejection of a medical opinion based on an incorrect reading of the record is grounds for remand." *Sedlak*, 2014 WL 717914, at *10 (citing *Mercer v. Colvin*, No. 12-CV-35-FHM, 2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013)).

Here, the ALJ specifically determined Plaintiff had no manipulative limitations, despite Dr.

25

Meier's concerns, saying "there is no other evidence that supports [Dr. Meier's] discrete observation of finger swelling, and the manipulative restrictions do not square with the record as a whole." Importantly, Dr. Meier did not impose any manipulative limitations; instead, he stated his concern that "excessive manipulative activities may continue to cause worsening of her symptoms," which he described as swelling and tenderness in the PIP joints, then noted he "would refer the patient for further evaluation." [AR 289-290]

The ALJ first determined no manipulative limitations were necessary for Plaintiff's RFC because Dr. Meier's was a **discrete** observation of finger swelling.  The ALJ is correct; there is nothing in the record indicating that another provider found swelling and/or tenderness in Plaintiff's PIP or DIP joints in her hands.

Second, the ALJ determined any manipulative limitations "do not square with the record as a whole."  Plaintiff argues that the record does, in fact, reflect that a provider has found the Plaintiff suffers manipulative problems supporting the imposition of limitations.  She points to a July 9, 2009 record describing Plaintiff's appointment with PA Kueter at which the Plaintiff complained of numbing and tingling in her right hand that "comes and goes"; Kueter diagnosed "right carpel tunnel" and provided a brace and recommended stretching exercises. [AR 272] Plaintiff also references a September 8, 2011 record describing Plaintiff's appointment with PA Kueter at which Plaintiff complained of left upper arm pain; Kueter diagnosed "neuralgia secondary to a brachial plexus contusion" in the left arm and recommended ibuprofen and stretching exercises. [AR 261] The Plaintiff references, and the Court has found, no other portions of the record reflecting problems with Plaintiff's upper extremities.

26

As set forth herein, the Plaintiff's disability onset date was January 4, 2012. [AR 12] "By definition, 'the onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.'" *Grabczyk v. Astrue*, No. 09-cv-02155-WYD, 2010 WL 3894113, at *3 (D. Colo. Sept. 30, 2010) (quoting SSR 83-20, 1983 WL 31249, at 1 (1983)).  Evidence beyond the period of disability may be considered to the extent it sheds light on the nature or progression of a claimant's impairments (*see Saum v. Astrue*, 09-cv-02091-REB, 2010 WL 3874387, at *5 (D. Colo. Sept. 29, 2010) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)), but it is improper to rely on that evidence to ultimately determine the claimant's RFC.  *Grabczyk*, 2010 WL 3894113, at *3.

Here, it would have been proper for the ALJ to consider medical evidence outside of the disability period to determine the nature and/or progression of Dr. Meier's finding of swelling in Plaintiff's PIP and DIP joints (possible arthritis).  Neither record on which the Plaintiff relies relates to joint swelling or arthritis.  As for Plaintiff's argument that the ALJ may not rely on the absence of evidence for her determination, such is true only for an *affirmative* determination such as finding a claimant to have the capacity to perform medium work.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993).  It is certainly proper for the ALJ to determine there is insufficient evidence in the medical record to support a limitation or restriction imposed in an RFC.

Even had the ALJ affirmatively rejected specific manipulative limitations recommended by Dr. Meier, the Court finds her rejection was proper considering the lack of evidence (even from Dr. Meier himself) supporting the imposition of manipulative limitations in the RFC.  In fact, the state agency physician who reviewed the disability examiner's evaluation of Dr. Meier's opinion agreed

with the finding of no manipulative limitations and found

> Even though at CE there is swelling in finger joints no complaints related to hands. Strength is intact. Evidence dated 9/11 from treating source documents no swelling. This may suggest diagnosis of RA but not established and no treatment started. This impairment may not last for 12 months. Since claimant is not seen by treating source and no diagnosis severity cannot be assessed currently. There is durational issue. RFC is not unreasonable and applies from AOD to 1/12 and projected from 1/12 to 1/13 as improvement expected with treatment.

[AR 297] Accordingly, the Court finds substantial evidence in the record supporting the ALJ's determination that no manipulative limitations were required for Plaintiff's RFC.

**D.      Whether the ALJ Properly Rejected Dr. Vega's Opinion**

In December 2012, Plaintiff's counsel arranged for Plaintiff to be seen by Jose Vega, Ph.D. for a mental health evaluation. [AR 377-382]  As set forth above, Dr. Vega noted that, despite her reports of sexual assault, Plaintiff did not present with any symptoms of post-traumatic stress disorder, but did appear anxious. [AR 379]  He found that Plaintiff functioned at a low- to borderline level of intelligence and, despite her pain complaints, she did not present with any significant pain behavior. [AR 380] Dr. Vega diagnosed Plaintiff with major depression, recurrent, moderate to severe; anxiety disorder, NOS; and history of alcohol abuse, and assessed Plaintiff a GAF score of 55-60 (current). [AR 381] He noted that Plaintiff's depression and anxiety had not been treated on a consistent basis as "it is unclear as to how consistent she is taking the medication," and she "is in need of psychiatric intervention." [AR 381-382]  Dr. Vega completed an RFC Evaluation (Mental) form in which he rated Plaintiff as having mostly moderate to marked limitations in understanding and memory, sustained concentration and persistence, and adaptation, and marked to extreme limitations in social interaction. [AR 383-384]

28

With respect to Dr. Vega, the ALJ found:

> In December 2012, the claimant attended a psychological evaluation arranged by the claimant's representative (Exh. 19F). Dr. Vega noted that the claimant presented with some problems with attention and concentration and some mild memory problems, that she preferred to be alone, and that she could be angry, irritable and easily upset (Id.). He assigned a moderate range GAF score (Id.). But Dr. Vega concluded that the claimant displayed moderate to marked limitations in most areas of understanding and memory, sustained concentration and persistence, social interactions and adaptation, which does not comport with his moderate GAF score or his observations of mild memory problems (Id.). In addition, there is no indication that Dr. Vega is aware of the requirements of the Social Security Administration for a finding of disability, while the claimant underwent the examination not in an attempt to seek treatment for symptoms, but rather through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, the doctor was presumably paid for the report. Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored. For all these reasons, Dr. Vega's opinions are given little weight.

[AR 22] The ALJ also noted the following regarding Plaintiff's visit with Dr. Vega, as compared to her earlier visit with the consultative examiner:

> While at the psychological evaluation in January 2012, the claimant related vague symptoms of depression, though the primary observation was of her irritability, focused primarily on staff members. She claimed no history of depression until her back injury occurred (Exh. 6F). The interviewer said he was concerned about symptom exaggeration, as well as poor effort, and her global functioning was placed just within the range of moderate impairment (GAF 60) (Id.). But when counsel directed the claimant to a psychological examination in December 2012, she reported a long history of depression, and provided numerous symptoms, including auditory hallucinations (which she had denied at the earlier evaluation), and distrust of men related to a history of assaults, though the claimant admits that she lives with a man (Exhs. 6F; 1 9F). Global functioning was placed within the range of moderate impairment (GAF 55 to 60) (Id.). The contradictions do not bolster her credibility with respect to her claim of disability, while the assessment of no more than moderate global limitations fails to impress the undersigned with respect to the severity of her mental health difficulties. While the undersigned is persuaded that some accommodation for psychological issues is necessary for her to function in the workplace, there is insufficient evidence as a whole to conclude that she remains

incapable of performing some type of simple work.

[AR 20-21]

The Plaintiff argues the ALJ's reasons for rejecting Dr. Vega's opinion – (1) the doctor was not aware of Social Security requirements; (2) examination was attempt to generate evidence; and (3) Dr. Vega's stated limitations were inconsistent with his GAF score and observations – were improper. Defendant counters that the primary reason for the ALJ's determination was her proper finding of inconsistencies between Dr. Vega's narrative report and the RFC form he completed. In addition, Defendant contends that the other reasons are ancillary; nevertheless, the context in which Plaintiff visited Dr. Vega was properly considered given record evidence that Plaintiff was not compliant with mental health medication and treatment. Plaintiff replies that the ALJ improperly substituted her lay opinion for the meaning of medical data in Dr. Vega's RFC form.

The Court notes first that the ALJ did not reject Dr. Vega's opinion outright; rather, she accorded his opinion "little weight." As set forth herein, if the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician (as here), the ALJ must consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Sedlak*, 2014 WL 717914, at *10.

Certainly, the ALJ's findings reflect that she considered more than just a single factor to

determine the weight given to Dr. Vega's opinion.[5]  For example, in noting that the "claimant underwent the examination not in an attempt to seek treatment for symptoms, but rather through attorney referral and in connection with an effort to generate evidence for the current appeal,"[6] the ALJ demonstrated her consideration of the first three factors: length of the treating relationship, frequency of examination, and nature and extent of the treating relationship.  Further, in finding that Dr. Vega's opinion contained inconsistencies, the ALJ reflected her consideration of the fourth and fifth factors: evidentiary support and consistency with the record.  Accordingly, the Court finds the ALJ's consideration in this regard was proper.

Further, the Court finds the ALJ's assignment of "little weight" to Dr. Vega's opinion is supported by substantial evidence.  An ALJ must "give good reasons in the notice of determination or decision for the weight [s]he ultimately assigns the opinion."  *Watkins*, 350 F.3d at 1301 (internal quotation marks, internal brackets, and citation omitted).  The ALJ's determination that Dr. Vega's narrative and GAF score do not match the findings he noted in the RFC form is not based on any improper interpretation of medical data, as Plaintiff contends.  Rather, the ALJ's evaluation is based on Dr. Vega's narrative evaluation, in which he found Plaintiff was "oriented to time, place, person and situation," "present[ed] with significant depression and anxiety," and

present[ed] with some problems with attention and concentration, with some mild

---

[5]Notably, the ALJ need not discuss each individual factor.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

[6]The Plaintiff's argument that the ALJ relied on Dr. Vega's "lack of awareness" of the Social Security regulations for her assigning little weight to his opinion is not persuasive.  The Plaintiff takes the ALJ's statement out of context, as it prefaces and refers to the second part of the sentence concerning the nature and scope of the examination.

memory problems, which would seem to be related due to her depression. She is using alcohol as a way to medicate for her depression. Historically, she did report that she has had more difficulty within the past few years. Prior to that, she indicated that she was a social drinker. Nonetheless, it is seen that she is in need of mental health treatment. She does not tolerate being around other people; prefers to be by herself, reporting being angry, irritable and easily upset.

[AR 381-382] In addition, the evaluation is based on Dr. Vega's GAF score of 55-60, which, according to the American Psychiatric Association, denotes the higher end of the range[7] for "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Notably, this information (narrative and GAF score) appears, on its face, to be inconsistent with Dr. Vega's notations of "moderate to marked" limitations and "marked to extreme" limitations for 17-20 areas of functioning on the RFC form. [AR 383-384]

More importantly, however, the ALJ's finding of inconsistencies between Dr. Vega's RFC limitations and the record, as well as her determination of "little weight" accorded Dr. Vega's opinion, are supported by the record as a whole; it was only to Dr. Vega, an examiner to whom Plaintiff's counsel referred her for consultation (not treatment), that the Plaintiff related a "a long history of depression, and provided numerous symptoms, including auditory hallucinations (which she had denied at the earlier evaluation), and distrust of men related to a history of assaults, though the claimant admit[ted] that she live[d] with a man"; there is no indication in the record of any such report by the Plaintiff to any other provider. *See Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007).  The ALJ also noted other inconsistencies with Plaintiff's reports and resulting negative

---

[7]The higher the number, the milder the symptoms and the higher the capacity to function. *See Keyes-Zachary*, 695 F.3d at 1162 n.1.

impact on Plaintiff's credibility. *Id.* (noting that an ALJ's credibility findings deserve special deference).

Accordingly, the Court finds the ALJ's decision is supported by substantial evidence in the record as a whole, and she complied with the applicable legal standards by providing a specific, legitimate reason for according little weight to Dr. Vega's opinion.

**E.     Whether the ALJ Properly Elevated the Nonexamining Psychologist's Opinion**

On February 20, 2012, a nonexamining psychologist, Mary Ann Wharry, Psy.D., reviewed the evidence in support of Plaintiff's stated mental disability and concluded Plaintiff suffered from a nonspecific affective disorder; Plaintiff's statements regarding her symptoms were "partially credible"; based on Dr. Vallette's findings, Plaintiff "appears moderately impaired"; and she concluded:

> The clmt retains mental ability to do work not involving significant complexity or judgment; can do work requiring up to 3 months time to learn techniques, acquire information and develop facility needed for an average job performance; can respond appropriately to supervision, coworkers but must have minimal to no interaction with the general public.

[AR 63]

The ALJ found the following regarding Dr. Wharry's opinion:

> After reviewing the evidence in support of the psychological issues in February 2012, a State agency doctor determined the claimant capable of performing work not involving significant complexity or judgment that could be learned in up to three months, as long as it involved minimal, to no, interaction with the general public (Exhs. 3A; 4A). Considered the expert opinion of a nonexamining source, the State agency psychologist's opinion is accorded significant weight, as it is well supported by, and consistent with, the record as a whole, showing no attempt to pursue mental health treatment, mild impairment in cognitive functioning, and some difficulties with interpersonal relations (Exhs. 6F; 7F; 19F).

[AR 22]  Plaintiff argues that the ALJ "pitted" Dr. Wharry's opinion against Dr. Vega's opinion and elevated the former over the latter.  The Court disagrees with Plaintiff's characterization; while the ALJ accorded more weight to Dr. Wharry's opinion, there is no indication by the ALJ that she "pitted" any opinion against another.  However, the Plaintiff is correct that the SSA presumes greater weight will be accorded to an examining physician than to a nonexamining physician.  The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians and "nonexamining" (or "consulting") physicians. *See, e.g.,* 20 C.F.R. § 416.927(c).  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  The ALJ must give "good reasons" for the weight he or she ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301.

Plaintiff cites *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) for the proposition that "the ALJ cannot accept the opinion of a non-examining physician over that of the examining physician unless the ALJ explains why the non-examining physician's opinion is entitled to greater weight, not the other way around."  Opening Brief, docket #14 at 42. The Tenth Circuit in *Hamlin* interpreted an earlier opinion in finding, "[w]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around."   365 F.3d at 1215 (quoting *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).  Neither *Hamlin* nor *Goatcher* expand on this finding; rather, *Goatcher* cited *Reyes v. Bowen*, 845 F.2d 242,

34

245 (10th Cir. 1988) in which the Tenth Circuit found error by the Secretary, who discounted the weight of a treating physician's opinion reasoning, "[the treating physician's] reports contain no finding which would outweigh those reported by the specialist, and which were supported by clinical and laboratory tests." The *Reyes* court concluded, "[t]he treating physician's opinion is to be given greater weight than an examining physician's opinion. So, the examining physician's report should be examined to see if it 'outweighs' the treating physician's report, not the other way around." 845 F.2d at 245 (citations omitted).

Using this case law as support, the Plaintiff argues that it was incumbent upon the ALJ to directly *compare* Dr. Vega's report with Dr. Wharry's report to determine whether Dr. Wharry's findings "outweighed" Dr. Vega's; in so doing, Plaintiff contends the ALJ was required to consider the same "weight factors" for both opinions. Specifically, Plaintiff asserts the ALJ committed error in determining Dr. Wharry's findings to be consistent with the record as a whole, but making no determination as to whether Dr. Vega's findings were consistent with the record as a whole.

The Court found nothing in the case law nor applicable regulations requiring the ALJ to compare medical opinions using the exact same factors to demonstrate why one opinion is accorded more weight than another, even where there is a presumption in favor of a certain type of opinion. Rather, the Court finds that, so long as the ALJ provides good reasons (supported by substantial evidence) for the weight accorded to an opinion, such reasons should provide a reviewer with the ability to determine why one opinion is accorded more weight than another. *See Reyes*, 845 F.2d at 245 (conclusory statements do not provide the justification legally required for rejecting a treating physician's opinion and accepting instead an examining physician's opinion).

Here, the Court has already determined the ALJ provided a good reason for discounting Dr. Vega's opinion; accordingly, the Court will proceed to determine whether the ALJ provided a good reason for the weight she gave Dr. Wharry's opinion.  The ALJ accorded significant weight to the opinion because "it is well supported by, and consistent with, the record as a whole."[8]  Contrary to the Plaintiff's argument that the ALJ fails to elucidate, the ALJ, in fact, explains that the opinion and the record both demonstrate Plaintiff "show[ed] no attempt to pursue mental health treatment, [she had] mild impairment in cognitive functioning, and [she had] some difficulties with interpersonal relations." [AR 22] The Court concludes the record, indeed, contains evidence of these problems; thus, the ALJ's reason is good and supported by substantial evidence in the record.  Moreover, the Plaintiff's contention that the ALJ failed to determine whether Dr. Vega's opinion was consistent with the record as a whole is illogical; in determining that Dr. Vega's opinion contained internal inconsistencies, it follows, then, that the opinion could not have been consistent with the record.

Accordingly, the Court affirms the ALJ's findings as to Dr. Wharry's and Dr. Vega's opinions.

## CONCLUSION

In sum, the Court concludes that the ALJ properly weighed Dr. Vega's and Dr. Wharry's opinions, and concluded no manipulative limitations were necessary for the RFC.  However, the ALJ failed entirely to weigh Dr. Rizzo's opinion and failed to explain why she accepted Dr. Meier's

---

[8]The Court finds Plaintiff's argument that the ALJ accorded significant weight to Dr. Wharry's opinion because it was "an expert opinion of a nonexamining source" is not persuasive. Again, the Plaintiff takes the ALJ's statement out of context, as it prefaced and related to the reason recognized by the Court.

opinion, but did not apply the postural limitations to the RFC. These failures require remand "so that the ALJ can explain the evidentiary support for [her] RFC determination." *Haga*, 482 F. 3d at 1208. Upon remand, the Court directs the Commissioner to reconsider the decision in light of the ALJ's deficiencies.

Therefore, the decision of the ALJ that Plaintiff Gwendolyn Hartman was not disabled is **AFFIRMED IN PART AND REVERSED IN PART, AND REMANDED** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 9th day of April, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge